## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 05-cr-40029-JPG |
| | ) | |
| WABASH VALLEY SERVICE | ) | |
| COMPANY et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

**GILBERT, District Judge:**

This matter is before the Court on Defendants' joint motion to dismiss the charges against them and to declare 7 U.S.C. § 136j(a)(2)(G) unconstitutional (Doc. 43). Defendants submitted a memorandum in support of their motion (Doc. 44), to which the government has responded (Doc. 47) and Defendants have replied (Doc. 53). The Court heard oral argument on this motion on February 16, 2006. Having considered the briefs and arguments in this case, the Court finds that 7 U.S.C. § 136j(a)(2)(G) ("the statute") is unconstitutionally vague as applied here insofar as it incorporates certain provisions from the labels of two pesticides, AAtrex 4L ("AAtrex") and Bicep II Magnum ("Bicep"). Therefore, Defendants' motion (Doc. 43) is **GRANTED** and the charges against the Defendants in this case are **DISMISSED**.

## BACKGROUND

The incident giving rise to this prosecution took place on May 8, 2000. On that date, defendant Noah Horton ("Horton"), a Wabash Valley Service Company ("Wabash") employee applied two restricted-use pesticides subject to the provisions of the Federal Insecticide Fungicide

and Rodenticide Act, 7 U.S.C. §§ 136 *et seq*. ("FIFRA"), to a farm in Hamilton County, Illinois. Horton applied pesticides that had been impregnated[1] onto fertilizer pellets using an "air flow application rig" – a tractor-like vehicle fitted with booms.  Elaine Zohfield ("Zohfield"), a neighbor who observed (and videotaped) Horton's application of the pesticides, complained to authorities about Horton's activities because she was worried that these pesticides would drift, and then saw (and filmed) these pesticides drifting onto her land.  According to records kept by Wabash, the wind that day was blowing at approximately 20 m.p.h. toward Zohfield's farm.  At trial, the government intends to show that when applicators apply pesticides through the impregnated fertilizer method, the pebble-like fertilizer pellets break down and generate fine particles that can drift when the weather conditions are not appropriate for application.  The government claims the windy conditions that day caused this pellet dust to drift onto Zohfield's property.

The pesticides used by Horton that day, AAtrex and Bicep, both contain the chemical atrazine.  The EPA has classified these chemicals restricted-use pesticides because of atrazine's toxicity to aquatic life.  In its offer of proof, the government submits that Horton applied these pesticides illegally because he did so contrary to three specific provisions contained in the AAtrex and Bicep labels.  The first two provisions appear on both labels:  "Do not apply this product in a way that will contact workers or other persons, either directly or through drift;"(Doc. 44-2 at 2, 44-4 at 2) and "To avoid spray drift, do not apply under windy conditions."(Doc. 44-2 at 3, Doc. 44-4 at 3).  The government also claims Horton failed to comply with a second provision of the AAtrex

---

[1]Impregnation refers to the process where pesticides are mixed with a dry bulk granular fertilizer prior to application.  (Doc. 44 at 8).  According to Defendants, the impregnated fertilizer takes on a solid form and resembles a small pebble.

label which reads "Do not apply when weather conditions favor drift from treated areas." (Doc. 44-5 at 7).  In its brief and at oral argument, the government represented that these three provisions are different ways of saying the same thing:  Do not apply when it is too windy.  (Mtn. Hrg. Tr. at 44).

## ANALYSIS

The statute reads as follows:  "It shall be unlawful for any person . . . to use any registered pesticide in a manner inconsistent with its labeling."   7 U.S.C. § 136j(a)(2)(G).   It simply incorporates the label provisions of registered-use pesticides into itself and provides for criminal penalties for the failure to comply with them.  Defendants claim the three provisions under which the government is bringing its case are so vague that they make the statute unconstitutional as applied.  They also claim it is void on its face for reasons the Court will discuss below.

The most recent Supreme Court case giving the vagueness doctrine in-depth treatment was *City of Chicago v. Morales*, 527 U.S. 41 (1999).  There, the Supreme Court found the statute at issue unconstitutionally vague, but did so in a plurality decision.  Because the decision was a plurality, *Morales* left the Supreme Court's vagueness jurisprudence unclear.   The broad outlines of the doctrine, however, are relatively clear.   "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  A law must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited so that he may act accordingly." *Id*.  In other words, the statute must be sufficiently clear to provide individuals with fair notice that their conduct is prohibited.  In addition, a criminal statute must define the conduct prohibited under in its terms "in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). The Supreme Court has sometimes characterized the enforcement facet of the vagueness

doctrine as the most "important." *Id*. at 358.  It has focused on this dimension because the lack of minimal guidelines for enforcement "may permit 'a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections." *Id*. (quoting *Smith v. Goguen*, 415 U.S. 566, 574 (1974)).

When a statute purports to regulate constitutionally protected conduct, the Court has said that a statute can be held unconstitutionally vague on its face despite the fact that the statute may not be unconstitutionally vague in all its applications.  *Kolender*, 461 U.S. at 358 n.8 (collecting cases).  Whether a court should, and the extent to which a court can, invalidate a statute on its face has been the subject of a heated debate over the years.  *See, e.g., id*. at 371 (White, J., dissenting).  Some members of the Court have attempted to draw a distinction between constitutionally protected conduct generally, and conduct protected by the First Amendment.  In any event, a majority of the Court – some justices more grudgingly than others – has determined that the "overbreadth" doctrine allows for facial invalidation of statutes that implicate First Amendment freedoms.  *Morales*, 527 U.S. at 52.  Under this doctrine, a law inhibiting the exercise of First Amendment rights may be facially invalid if the "impermissible applications of the law are substantial when 'judged in relation to the statute's plainly legitimate sweep'."  *Id*. (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 612-15 (1973)).

In *Morales*, Justice Stevens, joined by Justices Souter and Ginsburg, found that courts may declare statutes facially invalid for vagueness under the overbreadth doctrine and in a second situation, where a statute "fails to establish standards for the police and public that are sufficient to guard against the arbitrary deprivation of liberty interests." 527 U.S. 41, 52 (1999) (citing *Kolender*, 461 U.S. at 358).  In making this finding, the Court suggested that a statute that regulates business

activity only, and does not implicate other constitutional rights might not be subject to a facial attack in the second circumstance.  *Id*. at 55 ("This is not an ordinance that simply regulates business behavior and contains a scienter requirement.  It is a criminal law that contains no mens rea requirement and infringes on constitutionally protected rights.  When vagueness permeates the text of such a law, it is subject to facial attack.") (internal citations and footnote omitted). That two separate avenues for facial invalidation exist was not a position that a majority of the *Morales* Court accepted.  Justice Scalia, for example, questioned the propriety of ever declaring a statute invalid on its face, citing advisory opinion concerns.  *Morales*, 527 U.S. at 77 (Scalia, J. dissenting). Acknowledging that the Court had found, on a number of occasions, statutes facially invalid, Justice Scalia noted that the Court had only done so when the litigant established that the statute at issue was unconstitutional in all its applications.  *Id*.  For this proposition, Scalia relied on, among other cases, *United States v. Salerno*, 481 U.S. 739 (1987).  There, the Court said "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the *challenger must establish that no set of circumstances exists under which the Act would be valid*." *Morales*, 527 U.S. at 78-79 (Scalia, J. dissenting) (quoting *Salerno*, 481 U.S. at 745).  The above analysis is necessary here, because the parties take the respective positions of the two main factions of the *Morales* Court, Defendants asserting the position espoused by Justice Stevens, and the government championing the position of Justice Scalia.

Significantly, the Supreme Court and the Seventh Circuit have indicated that non-First Amendment-implicating statutes are not subject to facial attack.  *See, e.g., Maynard v. Cartwright*, 486 U.S. 356, 361 (1988) (vagueness claims not implicating First Amendment concerns must be evaluated as-applied only); *see also United States v. Cherry*, 938 F.2d 748, 753 (7th Cir. 1991)

(same).  The Seventh Circuit, for its part, has not taken a consistent position on the *Salerno* issue. In *A Woman's Choice-East Side Women's Clinic v. Newman*, the Seventh Circuit characterized *Salerno*'s "no set of circumstances" language as a suggestion not essential to the judgment in that case, and disregarded it in favor of contrary Supreme Court authority. 305 F.3d 684, 687 (7th Cir. 2002) ("Given the incompatibility between *Salerno*'s language and *Stenberg*'s [*v. Carhart*, 530 U.S. 914 (2000)] holding, it is the language of *Salerno* that must give way."); *see also Karlin v. Foust*, 188 F.3d 446, 483 (7th Cir. 1999) ("In *Casey*, the Court appears to have tempered, if not rejected, *Salerno*'s stringent 'no set of circumstances' standard in the abortion context."). On the other hand, the Court indicated the "no set of circumstances" test is the law of the circuit in *Daniels v. Area Plan Comm'n of Allen County*, 306 F.3d 445, 467 (7th Cir. 2002) ("[T]o mount a successful facial challenge the plaintiff must establish that no set of circumstances exists under which the Act would be valid.") (internal quotation and citation omitted).  Significantly, the Supreme Court has said that "economic regulation is subject to a less strict vagueness test because its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action."  *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982) (footnote omitted). As a final general matter, it is necessary for the Court to consider the following admonition from the Supreme Court in *United States v. National Dairy Products Corp.*,

> The delicate power of pronouncing an Act of Congress unconstitutional is not to be exercised with reference to hypothetical cases . . . . [A] limiting construction could be given to the statute by the court responsible for its construction if an application of doubtful constitutionality were . . . presented. We might add that application of this rule frees the Court not only from unnecessary pronouncement on constitutional issues, but also from premature interpretations of statutes in areas where their constitutional application might be cloudy.

372 U.S.29, 32 (1963) (quoting *United States v. Raines*, 362 U.S. 17, 22 (1960)). With these considerations in mind, the Court will address the specific claims in this case.

### A.        The Facial Challenge

Defendants claim the statute is void on its face because the phrase "manner inconsistent with its labeling" does not apprise applicators of which actions taken inconsistent with product labeling will subject them to criminal sanction.  The labels placed on pesticides subject to FIFRA contain a number of safety indications as well as suggestions as to efficient and proper product use.  One such suggestion reads: "For best results, apply [Bicep] to weed-free soil following use of a preplant surface, preplant incorporated, or preemergence herbicide, or following a lay-by cultivation. . . ." (Doc. 44-4 at 4).  Thus, under a straightforward application of 7 U.S.C. § 136j(a)(2)(G), Defendants maintain that an individual could be subject to criminal sanction if he failed to follow the above-quoted suggestion.  This uncertainty, claim Defendants, forces commercial applicators to speculate as to which inconsistent acts are criminal.  That the statute forces them, among others, to speculate as to which provisions they must strictly adhere to makes this statute unconstitutionally vague in accordance with Stevens's plurality opinion in *Morales*.

The government does not believe Defendants may challenge this statute facially because it does not implicate First Amendment concerns. *Maynard*, 486 U.S. at 361; *Cherry*, 938 F.2d at 753. The government does however, address the merits of Defendants' facial challenge.  As a starting point for analysis, the government directs the Court to *United States v. Corbin Farm Service*, 444 F.Supp. 510 (D.C. Cal. 1978), the only reported case addressing the vagueness of the statute.  In *Corbin Farm Service*, the court found that the phrase "inconsistent with its labeling" was not vague. *Id*. at 516-17.  Interpreting the statutory language the court stated, "It is clear enough that, if one

applies a pesticide in a way contrary to the directions on the label, one has violated the statute." *Id.* at 516.   In that case, the court found that courts reviewing the statute here should "not be too demanding" and that it would not find the statute vague "simply because [it might be difficult to determine] whether certain marginal offenses fall within their language." *Id.* at 515, 516 (second quotation from *National Dairy Products Corp.*, 372 U.S. at 32-33).

In its more precise application, the government claims the statute does not really force applicators to speculate what conduct will subject them to criminal sanction.   It claims common sense and experience allow applicators to determine which portions of the labels are advisory and which are mandatory. A sentence beginning "Do not apply . . ." is plainly distinguishable from one that begins "For best results . . ."   Further, the government claims that the nature of the criminal prohibition in the statute is clear to those to which it applies.   Though not in force at the time of the incident here, the government cites to a Pesticide Registration Notice (an EPA policy document) published by the EPA, which allegedly makes the interaction between the statute and the labels clear.  In Pesticide Registration Notice 2000-5[2] the EPA distinguishes between mandatory labeling statements – statements that include imperative verbs such as "must" or "shall" – and advisory statements – those written in descriptive or "nondirective" terms.   U.S. ENVIRONMENTAL PROTECTION AGENCY, PESTICIDE REGULATION (PR) NOTICE 2000-5: GUIDANCE FOR MANDATORY AND ADVISORY LABELING STATEMENTS, *at* http://www.epa.gov/PR_Notices/pr2000-5.htm. (last visited  Mar. 12, 2006) [hereinafter PR NOTICE 2000-5]. These advisory statements merely "provide information to the product user on such topics as product characteristics and how to maximize safety

---

[2]The EPA issued this notice on May 10, 2000 – after the incident here.  However, the government contends that the document accurately reflects pre-existing EPA practice and policy.

and efficacy while using the product." PR NOTICE 2000-5. The government believes this statement

makes the law clear and asks the Court to consider the EPA's construction here. *See Kolender*, 461

U.S. at 355.

After reviewing the law and arguments, the Court concludes that Defendants cannot make

a facial challenge to this statute. The Supreme Court and the Seventh Circuit have held in *Maynard*

and *Cherry* respectively, that facial challenges are only appropriate to those cases that implicate the

First Amendment. In any event, the plurality which suggested that a non-First Amendment-

implicating statute could be subject to a facial attack indicated that such would not be the case for

the regulation of business activity which did not implicate other constitutional rights. As the statute

at issue here simply regulates business activity, the Court finds that it is not subject to facial attack.

*Maynard*, 486 U.S. at 361; *Cherry*, 938 F.2d at 753.

    **B.**      **Unconstitutional as-applied**

Defendants claim this statute is unconstitutional as applied to them with respect to each of

the three label provisions the government claims Horton failed to follow. The initial point of

contention between the parties relates to the lens through which the Court should view these labels.

Defendants claim their status as persons with specialized knowledge should significantly color the

inquiry. Because the statute regulates commercial applicators, the Court should analyze the

provisions incorporated in it, for vagueness purposes, from the perspective of one with specialized

knowledge in the industry. A proposition similar to this finds substantial support in the case law,

in a line of analysis seeming to start with the 1926 Supreme Court decision in *Connally v. General*

*Const. Co.*, 269 U.S. 385 (1926). There, the Court indicated that a statute is sufficiently clear for

vagueness purposes when it "employ[s] words or phrases having a technical or other special

meaning, well enough known to enable those within [its] reach to correctly apply them." *Id*. at 391. The Court made similar pronouncements in subsequent cases as well. *See, e.g., McGowan v. Maryland*, 366 U.S. 420, 428 (1961) (suggesting in dictum that business people regulated by a statute would be able to understand what is covered under its terms as a matter of "ordinary commercial knowledge" or by making a reasonable investigation). The courts of appeals[3] have built upon this rationale and found that the vagueness standard is lower when a statute uses specialized phraseology apparent to those governed by its terms. In *United States v. Weitzenhoff*, 35 F.3d 1275, 1289 (9th Cir. 1993), the Ninth Circuit held that when a statutory prohibition

> involves conduct of a select group of persons having specialized knowledge, and the challenged phraseology is indigenous to the idiom of that class, the standard is lowered, and a court may uphold a statute which uses words or phrases having a technical or other special meaning, well enough known to enable those within its reach to correctly apply them.

(quoting *Precious Metals Assocs., Inc. v. Commodity Futures Trading Comm'n*, 620 F.2d 900, 907 (1st Cir. 1980)); *see also United States v. Elias*, 269 F.3d 1003, 1016 (9th Cir. 2001). Put slightly differently, the Court in *Precious Metals Assocs.* said that whether a statute is vague depends upon whether the "language sufficiently conveys a definite warning as to the proscribed conduct, when measured by common understanding and commercial practice." 620 F.2d at 907. Defendants urge the Court to apply this rationale in a slightly different context here. They argue that it is the specialized knowledge within the industry that makes the labeling discussed below vague and unclear.

---

[3] The Seventh Circuit has not explicitly applied this construction; however, its cases could be read accordingly. *See Coleman v. Ryan*, 196 F.3d 793, 797 (7th Cir. 1999); *Bence v. Breier*, 501 F.2d 1185, 1190 (7th Cir. 1974) (in determining if a statute is vague "it is necessary to examine whether the rule creates a standard of conduct which is capable of objective interpretation" by those who must abide by it).

The Government, on the other hand, believes the Court should evaluate the statements in the labels under a reasonable person standard.  It argues that when read by an individual of ordinary intelligence, the statements clearly indicate that applicators should not use these pesticides when they could be "blown" onto a neighbor's property or towards people.  The government does, however, claim that the provisions are not vague because they use specialized language understood in the industry, citing *Champlin Ref. Co. v. Corp. Comm'n of Oklahoma*, 286 U.S. 210, 242-43 (1932) (indicating that statute might not be vague if terms used were  familiar to those with knowledge of the subject regulated); *McGowan*, 366 U.S. at 428.

To the extent necessary, the Court finds that the statute should be read from the perspective of those subject to its application.  Whether the terms used in the label provisions have precise meanings that are different from the way a reasonable layman would understand them is an issue of fact.  In any event, the Court does not believe the resolution of this relatively fine point is outcome-determinative.

### i.        The First Provision in the Labels

The labels for both AAtrex and Bicep state: "Do not apply this product in a way that will contact workers or other persons, either directly or through drift."  Defendants claim the use of the phrase "in a way" references improper forms of application (*e.g.*, the use of a crop-duster, boom unit or other implement of application).  As the government claims Horton should not have applied the chemicals because of the wind, not that he used an improper form of application, Defendants claim the statute is unconstitutionally vague as applied here.  The government disagrees with this characterization.  It claims the prohibition is general in nature and that an ordinary person reading it would understand that it prohibits the application of the product where it may come into contact

11

with other people, regardless of the particular application method used.

The distinction Defendants attempt to draw between "condition" and "method" is not very persuasive. With respect to this provision, there is no claim that some specialized understanding in the industry fosters a mistaken view of the particulars of its requirements. The relative weakness of this position, however, does not diminish the potential infirmity of the provision as a whole. In their briefs and at oral argument, Defendants made an overarching argument directed at all three of the provisions here: that they simply do not let an applicator know what to do and what not to do. This is the heart of the inquiry; whether the provisions incorporated into the statute apprise an applicator of what conduct will subject him to sanction. As came out in the briefs and oral arguments, there are a number of ways in which these pesticides can come into contact with workers or other people. Counsel for the government indicated that if applicators apply a product in liquid form when there is little or no wind, the pesticide might become suspended in the air. (Mtn. Hrg. Tr. at 43). Thus, if the chemical is in the air for some time the potential for drift or for someone to come through a treated area will increase. Common sense and experience indicate that wind conditions are subject to abrupt change. These concerns are part of Defendants' broader argument. They tell the Court that the impregnated pellet method of application is a more time-consuming method, a method that reduces the risk of drift. Nevertheless, even using this method, both sides tell the Court that some drift will occur in almost all cases. (Mtn. Hrg. Tr. at 46). The EPA recognizes this as well. In their spray drift fact sheet, the EPA candidly admits "that some degree of drift from spray particles will occur from nearly all applications." U.S. ENVIRONMENTAL PROTECTION AGENCY, PESTICIDES: TOPICAL & CHEMICAL FACTS SHEETS: SPRAY DRIFT OF PESTICIDES, *at* http://www.epa.gov/pesticides/factsheets/spraydrift.htm. (last visited Mar. 12, 2006) [hereinafter

12

SPRAY DRIFT FACT SHEET].

After looking at this direction in the label, an applicator must decide how much wind is too much. If there is always going to be some drift, he must decide how much drift is acceptable. If "acceptable" is not the right term, then he must decide how much drift makes him subject to prosecution. If an applicator knows that a house is two-hundred and fifty yards away from a field where he needs to apply pesticides, it is clear he must consider the level of the winds and the method of application in determining whether he will be applying the pesticides in a way that they will come into contact with people. To be reasonable in this determination, must he also determine if people are in the house, and if so, whether they are likely to come outside and venture toward the fields? What about children? Must he determine whether children live in the house? Any reasonable person knows that children are liable to be in and out of a house and are not especially aware of the dangers of the kind presented here. If there are kids around, is two-hundred and fifty yards too close? Should he take other precautions? Maybe he should check with the parents of the children and find out when they will be at school so there is no chance they will come into contact with the pesticides. Does the age of the children change the answers to these questions? An applicator must consider other factors as well. He must take into account other environmental factors such as the humidity and topography of the landscape. The variables are indeed quite numerous. What should guide the applicator's decision?

The government tells the Court that this is a determination that depends on the circumstances and method of application. Fair enough. Nevertheless, does the label give an applicator any direction on this score? Clearly not. What about EPA? In its fact sheet, the EPA says simply that a "prudent and responsible" applicator considers all environmental factors, the proximity of people

and the method of application. SPRAY DRIFT FACT SHEET. The "EPA uses its discretion to pursue violations based on the unique facts and circumstances of each drift situation." SPRAY DRIFT FACT SHEET.  In the real world, this does not tell the applicator in the hypothetical above whether two-hundred and fifty yards is a fair distance with 10 m.p.h. winds.

The factual situation here raises the same kind of questions as the previous hypothetical.  The government is presumably claiming a violation of this provision because of Zohfield's presence. Here, one might reasonably ask if the level of precaution Horton should have taken changed because she was old enough to operate a video camera.  Based on the fact she was taping the occurrence that day, one can reasonably assume she put herself in the position to videotape Horton's actions intentionally.  The Court does not know if she was inside or outside her house.  If she was inside, would she have been in any danger?  Should Horton have anticipated that she *might* come outside to get a better shot?  If she was outside, did Horton need to calculate the risk differently because Zohfield put herself in harm's way?  All these questions trouble the Court.

When experienced trial attorneys decide whether to file a lawsuit, they often look at the instructions the court will give to the jury if the case makes it to trial.  By analyzing what he must prove to the jury, an attorney can make a reasonable approximation of the strength of his case.  The Court wonders if the government considered this simple question.  The Court has considered it, and, candidly, it is given pause by the question.  How should the Court instruct the jury here?  What if Horton knew there was some risk when he applied the pesticides that day but deemed the risk acceptable?  If the jury gives credence to his subjective determination, but they determine the risk too great objectively, must they find him guilty?  Though some of these questions are probably

answered in the FIFRA's penalty provision,[4] the Court must question whether the provision as incorporated in the statute gives an applicator enough guidance so that he can fairly be held to that standard.

The Court is left with another question raised only tangentially by the parties, but necessarily important, the enforcement of this provision. How do the authorities know what level of drift makes one subject to penalty under this provision? At oral argument, counsel for the government conceded, "some degree of drift is going to occur on almost every application." (Mtn. Hrg. Tr. at 46). Given this fact, the Court asked counsel whether that means that every applicator is potentially subject to criminal liability for what is essentially an unavoidable byproduct of his work. (*Id.*) In response, counsel for the government said he "hope[ed] that the government would use its discretion." (*Id.*) What guides the government's discretion? Does it only prosecute when a neighbor decides to videotape an incident and submit the tape to the authorities? Counsel is "sure [he] didn't say that." (*Id.*). Maybe so, but the implication is fairly drawn.

In *Kolender v. Lawson*, the Supreme Court found a California loitering statute which required those who loiter to provide a "'credible and reliable' identification and to account for their presence when requested by a peace officer under circumstances that would justify" a *Terry* stop unconstitutionally vague on its face. 461 U.S. at 353. This holding was based on the statute's

---

[4]7 U.S.C. §§ 136l(b)(1)(A) & (B) provide:
(A) Any registrant, applicant for a registration, or producer who knowingly violates any provision of this subchapter shall be fined not more than $50,000 or imprisoned for not more than 1 year, or both.
(B) Any commercial applicator of a restricted use pesticide, or any other person not described in subparagraph (A) who distributes or sells pesticides or devices, who knowingly violates any provision of this subchapter shall be fined not more than $25,000 or imprisoned for not more than 1 year, or both.

failure to clarify the meaning of "credible and reliable" identification. *Id*. at 354. Because federal courts must consider any limiting construction of a law by the state courts or enforcement agencies when they are asked to determine the facial validity of state laws, the Court considered the interpretation given to "credible and reliable" by the state courts: "identification carrying reasonable assurance that the identification is authentic and providing means for later getting in touch with the person who has identified himself." *Id*. at 355 & 357 (internal quotation and citation omitted). After considering the statute as limited by this and other constructions, the Court was convinced that it was virtually standardless. *Id*. at 358. The lack of meaningful guidance to authorities left enforcement of this provision to the whim of the police; the statute "furnishe[d] a convenient tool for harsh and discriminatory enforcement by local prosecuting officials, against particular groups deemed to merit their displeasure . . . and confer[ed] on police a virtually unrestrained power to arrest and charge persons with a violation." *Id*. at 360 (internal quotations and citations omitted). Clearly, the concerns of class- or race-based discrimination present in *Kolender* are not present here. However, the concern over arbitrary enforcement is just as real. If every application causes drift, then every single applicator could violate this provision when he applies pesticides. An applicator simply has no way of knowing whether he will be prosecuted because the statute leaves that decision entirely to the unguided discretion of the authorities.

In light of the concerns the Court has discussed, the Court finds that this provision is unconstitutionally vague. The prohibitions in this section are not clearly defined, and the Court is convinced that the section does not provide applicators with any reasonable notice of what conduct it proscribes. *See Grayned,* 408 U.S. at 108.

ii.    **The Second Label Provision**

The labels for both AAtrex and Bicep state: "[t]o avoid spray drift, do not apply under windy conditions."  Defendants claim the term "spray" as used in the labels is understood in the industry to mean the application of pesticides in liquid form.  They claim "spray drift" refers to the drifting of a chemical mist over a distance after an applicator releases the chemicals in liquid form. Defendants contrast this method with the method Horton used here, spreading – the term used for the application of impregnated fertilizer.  Defendants claim that the specialized meaning of the terms spray and spread in the industry makes the statute unconstitutional as applied.  They claim that the relevant inquiry is whether persons involved in the pesticide application business would have understood that the above-quoted phrase applied to Horton's conduct on May 8.  Because one in Horton's position would not have realized that spreading the impregnated fertilizer fell within the prohibition in the warning, Defendants claim he was not on notice that the provision proscribed his conduct that day.  On a more basic level, Defendants take issue with the guidance provided by the term windy.  They believe the term is simply too vague to guide their conduct in any meaningful way.  Finally, Defendants claim the use of the words "to avoid" is not a clear prohibition but merely advisory.

The government argues that the label makes it clear that applicators must avoid "spray drift" when using impregnated fertilizer – it does not really take a position on "spreading."  It grounds this argument in the label instructions on the Bicep product under the heading "Dry Bulk Granular Fertilizers."  In this section, the label states that "[w]hen applying Bicep . . . with dry bulk granular fertilizers, follow all directions for use and precautions on the . . . label regarding target crops, rates per acre, soil texture, application methods, and rotational crops."  (Doc. 44-2 at 3).  Thus, the label clearly tells applicators that all its restrictions apply to the spreading of fertilizer through

17

impregnated pellets.  The government also rejects Defendants' assertions that spray drift is restricted to the drift from liquid pesticides.  It claims that the term "drift" and "spray drift" are interchangeable.  In support of this, the government points the court to the EPA definition of spray drift as the "physical movement of a pesticide through the air at the time of application or soon thereafter."  SPRAY DRIFT FACT SHEET.  The government also cites similar provisions in the Illinois Pesticide Training Manual.[5]

For reasons similar to its decision on the first provision and for others detailed below, the Court finds that this second provision is unconstitutionally vague as applied because it did not apprise Defendants of the conduct that would subject them to criminal liability.  As an initial matter, Defendants have introduced the affidavits of unaffiliated members of the pesticide applicator community that support their contentions regarding the specialized meaning of the term "spray drift."  Of course this is a factual dispute, and thus possibly unsuitable for determination at this stage in the litigation.  *See Corbin Farm Service*, 444 F.Supp. at 518.  In any event, there is an *indication* that the term *may* be understood by those in the industry differently than the government's asserted meaning.  On that level then, Defendants, according to their own subjective understanding of the term, did not know that Horton's spreading of the pesticides would subject them to liability under a "spray drift" provision.  The government takes issue with the use of subjective understanding to determine the meaning of a criminal statute. It claims Defendants' subjective understanding of the language is irrelevant; that the only relevant inquiry is what the provision says, analyzed objectively.  Whatever the general applicability of that statement, it seems to the Court to be a rather weak

---

[5] According to the government, this manual is not mandatory reading, it is simply suggested that applicators read this manual before they take the licensing exam to be certified to apply restricted-use pesticides.

position here.  In dealing with similar issues, the Supreme Court, as stated above, has said that specialized understanding of terminology is a relevant factor in the vagueness inquiry.  *See Connally*, 269 U.S. at 391; *McGowan*, 366 U.S. at 428.  The First and Ninth Circuits have held similarly.  *See, e.g., Weitzenhoff*, 35 F.3d at 1289; *Precious Metals Assocs.* 620 F.2d at 907.  If these considerations can, in effect, lower the standard, it seems only reasonable that they can raise the bar as well.  The Court finds no principled basis for distinction.

In addition to the subjective understanding of those in the professional application community, there are other indications that "spray drift" refers to liquid application.  The Court knows of no better way of ascertaining the precise definition of a term than looking in the dictionary. Entry of "spray" into the search function at the web site www.dictionary.com[6] returned results supporting the notion that spray indicates liquidity.  The American Heritage® Dictionary of the English Language defines spray as "water or liquid moving in a mass of dispersed droplets, as from a wave." Dictionary.com, *at* http://dictionary.reference.com/search?q=spray   In its infinitive form, it is "to disperse (a liquid) in a mass or jet of droplets." *Id*.  WordNet® 2.0 defines spray as "a pesticide in suspension or solution; intended for spraying." *Id*.  Other online dictionary services returned similar results.  Merriam-Webster OnLine defines spray as "water flying in small drops or particles blown from waves or thrown up by a waterfall."  Merriam-Webster Online, *at* http://www.m-w.com/dictionary/spray (last visited Mar. 12, 2006)  Some definitions of the term from the Oxford English Dictionary include: "Water blown from, or thrown up by, the waves of the sea in the form of a fine shower or mist" and "Water or other liquid dispersed by impact or other

---

[6] Dictionary.com is a "multi-source dictionary search service" which performs searches in several dictionaries hosted on its site. *See* http://dictionary.reference.com/help/about.html. (last visited (Mar. 12, 2006) [hereinafter Dictionary.com].

means in fine mist-like particles." Oxford English Dictionary, *at* www.oed.com/ (last visited March 12, 2006).  From this review of online dictionaries, it is clear that spray primarily denotes liquidity.

Despite the apparent understanding in the industry and the common understanding of the term, the government contends that "spray" as used in the term "spray drift" is not a modifier; it claims the two terms (*i.e.*, drift and spray drift) are synonymous.  When the Court expressed its befuddlement at this redundancy, counsel for the government admitted, "it's poor drafting" but rested his claim of the terms' synonymy on the EPA's definition of spray drift.  (Mtn. Hrg. Tr. at 40).  In December 1999, the EPA promulgated the following definition of spray drift:

> the physical movement of a pesticide through air at the time of application or soon thereafter, to any site other than that intended for application (often referred to as off target).  EPA does not include in its definition the movement of pesticides to off-target sites caused by erosion, migration, volatility, or contaminated soil particles that are windblown after application, unless specifically addressed on a pesticide product label with respect to drift-control requirements.

SPRAY DRIFT FACT SHEET.  The clarification the government contends this definition accomplishes is vitiated by the next subsection of the fact sheet, titled "How Does Spray Drift Occur?"  It explains that:

> When pesticide solutions are sprayed by ground spray equipment or aircraft, droplets are produced by the nozzles of the equipment.  Many of these droplets can be so small that they stay suspended in air and are carried by air currents until they contact a surface or drop to the ground.  A number of factors influence drift, including weather conditions, topography, the crop or area being sprayed, application equipment and methods, and decisions by the applicator.

*Id*.  The only entry for "droplet" in Merriam-Webster's Online Dictionary defines a droplet as "a tiny drop (as of a liquid)."  Merriam-Webster Online, *at* http://www.m-w.com/dictionary/droplet (last visited Mar. 12, 2006).  Therefore, it seems the government is actually in a weaker position because the EPA defines how spray drift occurs in a way that primarily denotes liquid application.  The

Court is not suggesting that the government is being less than ingenuous in its arguments.  Rather, despite what the drafters of the provision may have meant, even the EPA fact sheet would make a reasonable person think spray drift implies liquid application.  This alone is sufficient to ground the Court's holding that this provision is unconstitutional as applied.  If the term did indeed cover Horton's activities, he was not on notice that his conduct ran afoul of this provision.

The spray drift language is not the only constitutional infirmity in this provision.  The Court also finds that the term "windy" is too vague to guide the conduct of Horton here.[7]  The only reasonable way to interpret this provision is to substitute the term "too windy" for "windy."[8]  Put another way, as the government has conceded, the provision essentially tells applicators not to apply pesticides when it is too windy. When viewed in this light, the best way to demonstrate the problem is by analogy.  Just as any reasonable person would agree that, as a matter of policy, the use of potentially dangerous chemicals should be regulated, reasonable people (outside of Germany) probably agree that for the safety's sake, the state should regulate the speed at which individuals may drive on the highway.  State governments have made policy decisions on this score and have determined that the speed limit on the highways should be somewhere between 65 m.p.h. and 75 m.p.h.  This decision probably does not reflect a scientific determination that traveling 66 m.p.h. or 76 m.p.h. on the highway is objectively unsafe.  Rather, lawmakers had to set the speed limit

---

[7]The following discussion is relevant to all three of the provisions attacked by Defendants' Motion.

[8] The term windy is defined as "characterized by or abounding in wind: *a windy night*." Dictionary.com *at* http://dictionary.reference.com/search?q=windy (last visited Mar. 12, 2006). In this context, perhaps the term is better characterized as the oppositive of, or absence of wind. The government concedes that the application of pesticides in some wind is acceptable.  If this is true, as it must be, then to the extent this provision has any meaning, it can only be read as indicating that applicators must not apply pesticides when it is too windy.

objectively, if not arbitrarily, and those speeds were either deemed, or for some other reason found

to be, appropriate.  An individual driving 85 m.p.h. north on Interstate 57 might not think he is

driving too fast, but he has a reasonably good idea that if he sees a cop, he is going to get a ticket.

In Illinois at least, the State does not tell its citizens that they should not drive "too fast."[9]  Reason

_____

[9] In the interest of a complete discussion, the Court must take note of 625 ILCS § 5/11-601 and similar "too fast for conditions" statutes.  Section 5/11-601 states:

> No vehicle may be driven upon any highway of this State at a speed which is greater than is reasonable and proper with regard to traffic conditions and the use of the highway, or endangers the safety of any person or property. The fact that the speed of a vehicle does not exceed the applicable maximum speed limit does not relieve the driver from the duty to decrease speed when approaching and crossing an intersection, approaching and going around a curve, when approaching a hill crest, when traveling upon any narrow or winding roadway, or when special hazard exists with respect to pedestrians or other traffic or by reason of weather or highway conditions. Speed must be decreased as may be necessary to avoid colliding with any person or vehicle on or entering the highway in compliance with legal requirements and the duty of all persons to use due care.

625 ILCS § 5/11-601.  At first blush, this statute might seem indistinguishable from a provision telling pesticide applicators not to apply pesticides when it is too windy because the statute essentially tells drivers not to drive at a speed which is "too fast for conditions." The Court believes this statute is meaningfully different from the provisions in the labels for several reasons. Importantly, the statute provides specific examples of situations that might require a driver to slow to a speed that is below the set speed limit.  It includes a non-exclusive list of *objective* conditions, such as intersections, hills, pedestrians and traffic that should affect the speed at which a driver travels.  The other examples of conditions are less objective.  Perhaps one could make vagueness attacks on what a curve is, or what makes a road winding or narrow.  However, the fact that some specific objective conditions and other subjective conditions are listed gives the reader examples from which he can reasonably infer other conditions which might make a reduction in speed appropriate.  Further, it puts him on notice that he is subject to penalty for failing to take account of the specific objective conditions listed in the statute.  The Court does not believe that this is a distinction without a difference.

The Court's research has not disclosed a vagueness challenge to the current version of the statute.  However, the Supreme Court of Illinois did entertain a vagueness challenge to a precursor statute in 1920.  In *People v. Beak*, 126 N.E. 201, 201-02 (Ill. 1920), the Court addressed a challenge to § 10 of the Illinois Motor Vehicle Act (Hurd's Rev. St. 1917, c.121, § 269j), a statute similar to 625 ILCS § 5/11-601.  That statute provided:

> No person shall drive a motor vehicle or motor bicycle upon any public highway in this state at a speed greater than is reasonable and proper having regard to the traffic and the use of the way or so as to endanger the life or limb or injure the property of

suggests that a random selection of individuals subject to such a requirement would have their own ideas about the meaning of "too fast."  Some might feel that the risk of driving 75 m.p.h. is negligible and therefore not "too fast."  Others, from experience or bad luck, might think that driving over 65 m.p.h. is just too risky, and therefore too fast.  Whatever their subjective beliefs on the safety issue, given the norms of today's drivers these people would not be on notice that they were driving too fast if they were pulled over by a police officer who thought anything over 50 m.p.h. was

---

any person. If the rate of speed of any motor vehicle or motor bicycle operated upon any public highway in this state where the same passes through the closely built up business portions of any incorporated city, town or village exceeds ten (10) miles an hour or if the rate of speed of any motor vehicle or motor bicycle operated on any public highway in this state where the same passes through the residence portions of any incorporated city, town or village exceeds fifteen (15) miles an hour or if the rate of speed of any motor vehicle or motor bicycle operated on any public highway in this state outside the closely built up residence portions and the residence portions within any incorporated city, town or village exceeds twenty (20) miles an hour or upon any public highway outside of the limits of an incorporated city, town, or village if the rate of speed exceeds twenty-five (25) miles per hour, such rates of speed shall be prima facie evidence that the person operating such motor vehicle or motor bicycle is running at a rate of speed greater than is reasonable and proper having regard to the traffic and use of the way or so as to endanger the life or limb or injure the property of any person. If the rate of speed of a motor vehicle or motor bicycle operated on any public highway in this state in going around a corner or curve in a highway where the operator's view of the road traffic is obstructed exceeds six (6) miles an hour, such rate of speed shall be prima facie evidence that the person operating such motor vehicle or motor bicycle is running at a rate of speed greater than is reasonable having regard to the traffic  and the use of the way or so as to endanger the life or limb or injure the property of any person.

*Id*. at 201-02 (citing Hurd's Stat. 1917, p. 2573). In that case, defendant essentially claimed that telling motorists not to drive "at a speed greater than is reasonable and proper having regard to the traffic and the use of the way or so as to endanger the life or limb or injure the property of any person" did not put them on notice as to what conduct was unlawful under the statute. The Court conceded that if the sentence quoted in the previous sentence constituted the entirety of the statute, that it might be void for vagueness.  *Id*. at 202.  However, because the statute provided examples of speeds that would be inappropriate under specific circumstances, the court found the statute constitutional as applied to the defendant.  *Id*. Thus, at least in Illinois, the Court's analogy to the speed limit laws is not meretricious.

23

too fast – unless perhaps this was the common policy of all police officers in an area. An individual driving 175 m.p.h. in a Porsche down a two-lane road in the rain and fog during heavy traffic would have a hard time convincing anyone that he was not driving too fast. No one has suggested that by applying the fertilizer here, Horton was exhibiting the same degree of recklessness. Put another way, no one has suggested that Horton's conduct was so outrageous that any fool would know he was breaking the law. In the same way that telling drivers not to drive too fast does not really tell them anything, telling applicators not to apply pesticides when it is too windy does not tell them anything either. The Court simply does not see how this language sets forth any kind of standard that would have put Horton on notice that his conduct violated the law.

In its briefs and at oral argument, the government placed great emphasis on the fact that commercial applicators must receive training and obtain a license from the state to apply these pesticides. Their experience, training and study, claims the government, make those licensed to apply these pesticides cognizant of when it is too windy. If they do possess this ability, it is certainly not the standard policy of the State to trust people to make those kinds of decisions. At least sometimes, conduct of experienced professionals that affects the public safety does not go unguided. At the risk of beating a dead horse, the Court will return to the speed limit analogy. The men and women who drive eighteen-wheel trucks receive training and must be specially licensed to do so. Without question, there are truck drivers out there who have been driving up and down America's highways every day for thirty years. Surely these drivers have seen every kind of weather and traffic condition on the highway. They probably have enough experience to determine what is too fast for a specific set of conditions. Just the fact that they are still alive after all those years shows that they are either lucky or reasonably safe. Even so, the government does not give them

an open-ended standard to guide their driving habits.  Though they are certified professional drivers,

they are still subject to speed limits, 55 m.p.h. on Illinois highways.  The state does not tell them not

to drive too fast.  The Court gives little credence to the government's argument on the importance

of experience here.

In *Colten v. Kentucky*, 407 U.S. 104, 110 (1972), the Supreme Court said that vagueness "is

not a principle designed to convert into a constitutional dilemma the practical difficulties in drawing

criminal statutes both general enough to take into account a variety of human conduct and

sufficiently specific to provide fair warning that certain kinds of conduct are prohibited."  The Court

does not believe the problem inherent in this provision results from such a dilemma.  The decision

in *Colten* turned, at least in part, on the Court's determination that "citizens who desire to obey the

statute will have no difficulty in understanding it."  *Id*.  This cannot be said for the provision at issue

here. Therefore, for reasons similar to those given for the first provision and the reasons specifically

directed at the second, the Court finds that this second provision is unconstitutionally vague as

applied to the Defendants.

### iii.    The Third Label Provision

The final provision comes from the AAtrex label.  It provides, "Do not apply when weather

conditions favor drift from treated areas."  Defendants claim this directive does not apply to wind,

but to surface migration or water runoff.  Again, Defendants take issue with the choice of words in

the provision.  They believe the terms "favor" and "weather conditions" provide no guidance as to

what is prohibited conduct and what is not.  The government argues that Defendants' reading of

"drift" language is troublesome in light of the definitions it has previously cited indicating that the

term "drift" contemplates movement by air.  The Court agrees with this contention.  However, for

reasons similar to the first two provisions and others, the Court finds this provision unconstitutionally vague as applied to the Defendants.

Telling applicators not to apply pesticides when weather conditions favor drift simply does not tell them anything meaningful. The Court has already established that some degree of drift occurs in almost every application. Even a small admixture of wind can make the sum total of the environment conditions at an application site likely to contribute to drift, whether the risk of drift arises from the dusty remnants of impregnated fertilizer or droplets of liquid fertilizer. If drift almost always occurs to some extent, then weather conditions almost always allow for drift. It seems to the Court that the most reasonable definition of favor here is "to make easier or more possible; facilitate." Dictionary.com *at* http://dictionary.reference.com/search?q=favor (last visited Mar. 12, 2006). For the sake of argument, one might assume that the provision contemplates or expects that applicators are aware of a sub-set of conditions in which the drift from application is within objectively acceptable bounds, say 10 m.p.h. No one disputes that when it is windier at time x than at time y, pesticides applied by means of liquid application will be more likely to drift at time x. Or, depending on the method of application, vice versa. Thus, one could say that the conditions at time x favor drift more than at time y. If one assigns a wind speed of 10 m.p.h. for time y and a wind speed of 11 m.p.h. for time x, then the conditions at time x clearly favor drift as compared to the conditions at time y. But if one takes for granted that 10 m.p.h. is a reasonable or acceptable level of wind speed to apply liquid pesticides, then the fact that, all other conditions being equal, drift is more likely, or facilitated at time x – despite the fact that it is only 1 m.p.h. removed from the 10 m.p.h. threshold for objective reasonableness – means that an applicator has violated this provision of the label. This simply cannot be. Absolutely nothing in this provision guides

applicators or the authorities.  Again, for reasons previously discussed, whatever training and experience an applicator might have does not cure the basic flaw of this provision.  Even if one trusts the judgment of an experienced applicator, his judgment does not make his speculation as to what an authority will consider reasonable any easier.  Maybe the applicator's experience is different from the authority's; these differences in the opinions of experienced professionals should not make the difference between criminal sanction and polite reproach.  It is concerns such as these that sometimes require the institution of a somewhat arbitrary dividing line – the 65 m.p.h. speed limit on Illinois interstates.  The government has made the Court aware of the somewhat convoluted process that results in the final wording of the provisions on pesticide labels. (Mtn. Hrg. Tr. at 34).[10] Even so, if these provisions are going to be incorporated into the nation's criminal laws, then they must meet the basic requirements of due process.  They must put those subject to their requirements on notice of the conduct they prohibit.  This might require a relatively arbitrary policy determination, such as, do not apply pesticides in impregnated pellet forms when the winds are 20 m.p.h. or greater.  If such explicit directions are included applicators will know what they must not do.  The Court does not believe such a requirement is too onerous.

Given the strong presumption in favor of the validity of an Act of Congress, the Supreme Court has often held that a court should not invalidate a statute "simply because difficulty is found

---

[10] Pesticides must be registered with the EPA under various federal statutes.  The registration process is composed of many steps.  Among other things, manufacturers must submit health and safety data, and multi-tiered studies on pesticide effectiveness under various conditions.  The labels for these pesticides must contain proper conditions for use for the various crops the pesticide is manufactured to treat.  In the first instance, the manufacturer who wishes to sell a pesticide submits the label's proposed language to the EPA.  After this, there is time for public comment where trade associations and various other interest groups have an opportunity to comment on the proposed language.  According to the government, it is this process that has lead to the admittedly unclear labels.  (Mtn. Hrg. Tr. at 34).

in determining whether certain marginal offenses fall within their language." *National Dairy Products Corp.*, 372 U.S. at 32 (collecting cases).[11]   In *National Dairy Products Corp.*, the defendants were charged with violating a provision of the Robinson-Patman Act, 15 U.S.C. § 13a, making it illegal to sell goods at unreasonably low prices in an effort to destroy competition or to eliminate a competitor. *Id.* at 29.   Conducting an as-applied inquiry into the validity of the provision, the Court tasked itself with determining whether defendants' selling of their goods below cost with "predatory intent" was within the "unreasonably low prices" prohibition of the statute.   *Id.* at 33. The Court found that defendants could reasonably understand that their conduct was prohibited by the statute because they sold their goods below cost.   *Id.* at 34-35.   The Court rejected their argument that the phrase "unreasonably low prices" was vague, and found that its determination of validity was bolstered by the inclusion of a proscribed mental state within the statute's terms.   *Id.* at 35 (finding that defendants' predatory intent met the requirement that goods must be sold "for the purpose of destroying competition.").   Here, given the provision's lack of direction to those regulated by its terms and its lack of direction to those responsible for enforcing the law, it simply cannot be said that the difficulty here is only found at the margins.   Further, differences in the requisite mental states in the statute here and in that case, make *National Dairy Products Corp.* plainly distinguishable.   One violates the Robinson-Patman Act by undercutting competitors' prices specifically to eliminate competition.   *Id.* at 33-34.   Here, the statute incorporates various provisions in product labels and  speaks to the mental state – knowledge not purpose – in another provision

---

[11] In *Corbin Farm Service*, the court discussed whether the level of deference it had to give to the label provisions was different from that given to standard pronouncements of Congress because Congress does not write these labels.  444 F.Supp. at 516.  The Court feels that it need not make this determination here because the provisions would be invalid regardless of whether it applied the higher, Act of Congress standard here.

altogether.  *See* 7 U.S.C. §§ 136l(b)(1)(A) & (B).  Under this label it is not just the marginal situations that are unclear, it is all but the most egregious situations that are unclear. Accordingly, for the reasons above the Court finds the third label provision unconstitutional as applied to the Defendants.

**<ins>CONCLUSION</ins>**

For the foregoing reasons the Court finds that 7 U.S.C. § 136j(a)(2)(G) is unconstitutional as applied here insofar as it incorporates the provisions from the AAtrex and Bicep labels discussed above.  Therefore, Defendants' motion to dismiss the charges and declare the statute unconstitutional (Doc. 43) is **GRANTED**.  The charges against the Defendants are **DISMISSED**.  The **Clerk of Court** is **DIRECTED** to enter judgment accordingly.

**IT IS SO ORDERED.**

**DATED: March 16, 2006.**

 <ins>**/s/ J. Phil Gilbert**</ins>
**J. PHIL GILBERT**
**U.S. District Judge**